**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **3:15-CR-87** |
| **v.** | : | **(JUDGE MANNION)** |
| **ROBERTO SANCHEZ,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Pending before the court is the motion to suppress evidence, (Doc. 53), filed by defendant Roberto Sanchez through his counsel. Sanchez allegedly conspired to distribute heroin and cocaine, and possessed with intent to distribute heroin and cocaine. Sanchez seeks to suppress the physical evidence seized from the search of his residence in Hazleton, PA after officers went there to arrest him without a warrant in relation to an earlier shooting incident in New York City. Officers forcibly entered Sanchez's house without a warrant claiming exigent circumstances existed. After Sanchez was apprehended in his house, he asked for his shoes and socks, and told an officer where they were located in his residence. When the officer was retrieving them, he observed a large amount of cash in Sanchez's sock dresser drawer along with cell phones and electronic devices. Sanchez's wife later allegedly gave consent to search their residence to look for a gun involved in the shooting. During the search, the officers found over $50,000 cash and drugs as well as other items. Sanchez claims that there were no exigent circumstances to allow officers to enter his house without a warrant

and that there was not valid consent for the search of his residence. He also claims that his subsequent confessions were the fruits of his unlawful arrest and the unlawful search of his house. The gist of Sanchez's argument is that the entirety of the search and seizure of evidence in his residence was in violation of the Fourth Amendment, and that his subsequent statements during his custodial interrogation were unlawful based on the fruit of the poisonous tree doctrine.

Sanchez requested an evidentiary hearing and the government concurred. The court granted the request since there were factual disputes at issue regarding the validity of the search, including whether there were exigent circumstances and whether there was consent for the search. A hearing was conducted on January 10, 2017. For the reasons discussed below, the motion will be **DENIED**.

## I.    FACTUAL BACKGROUND

Detective Robert Barclay of the fugitive enforcement division for the New York City Police Department ("NYPD") was advised that a police precinct in the Bronx was trying to locate Sanchez regarding a January 17, 2015 shooting incident and he was provided paperwork for the suspect. Specifically, on January 29, 2015, the NYPD issued an Investigative Card ("I-Card") that identified Sanchez as a fugitive wanted for the shooting of a man in the Bronx. (Doc. 69 at 5 & Ex. 12). Sanchez was identified by the

2

victim as the shooter. The I-Card was a mechanism used by the NYPD to notify officers in the city that a person who was the subject of an I-Card was wanted. The I-Card indicated that there was probable cause to arrest Sanchez for assault with intent to cause serious injury with a weapon, a first degree felony, and it listed his personal information. In particular, attached to the I-Card was a wanted poster with Sanchez's photo, and stated that he was wanted for assault in the first degree with a firearm, that there was probable cause to arrest him, and it gave the narrative of the shooting incident. The I-Card also had attached an April 28, 2015 letter from the Bronx County District Attorney's Office addressed to "Authorities in Pennsylvania" indicating that the office had agreed to file an arrest warrant if Sanchez was apprehended in their jurisdiction. (Id. at 7 & Govt. Ex. 12). It is undisputed that the I-Card and the wanted poster did not constitute a valid arrest warrant. (Doc. 69, Govt. Ex. 12).

After conducting an investigation to locate Sanchez, Barclay discovered in May 2015 that Sanchez may be residing in Pennsylvania. Barclay then contacted authorities from the Pennsylvania Regional Fugitive Task Force and asked for their assistance in locating Sanchez. He sent the task force the I-Card and attached information. The task force found an address in Hazleton, Pennsylvania at 215 South Butler Terrace, which was a residence associated with Sanchez and Claudia Sanchez ("Claudia"). Barclay and two NYPD officers as well as five members of the task force arranged to meet in the

morning at the Hazelton address on May 7, 2015. At this time, the firearm from the Bronx January 17, 2015 shooting had not yet been recovered and when officers were approaching the residence they allege that they had reason to believe that Sanchez might still have a firearm in the house. Barclay's primary objective was to find Sanchez and his secondary objective was to find the firearm used in the shooting incident.

The NYPD officers, the task force officers and four Pennsylvania State Police ("PSP") troopers met at the Hazleton house at 6:30 a.m. on May 7, 2015. The task force officers approached the Hazleton house in "stacking" formation and the lead officer, U.S. Deputy Marshal Robert Lenahan, was carrying a shield for protection. The officers knocked on the door and announced their presence. Nobody inside the house opened the door. After a few minutes, Lenahan indicated that Sanchez looked out through the screen in a second-story window of the house and then quickly retreated from it going towards the rear of the house. The officers shouted to Sanchez that they were from the police department and to come down and open his door. Task force officers later testified that from the second floor window, Sanchez had a full and unobstructed field of view of them on the lawn below his vantage point. After Sanchez was observed leaving the window, the officers knocked on the door again and directed him to open the door. However, the door was not opened. Officers testified that they believed Sanchez was hiding himself in the house and that he was possibly armed, so they obtained a ram from one of

4

the vehicles which was located down a couple of stairs and 25 to 40 feet away from the house. The officers then checked to see if the front door was unlocked but it was not. Thus, the officers forced open the front door with the ram. The government's witnesses could not specifically remember how much time elapsed between seeing Sanchez in the second floor window and breaching the front door. They estimated it as ranging from 15 seconds to a few minutes.

After the door was forced open and a few moments passed to let the situation settle, Sanchez was identified on the staircase in the house partially dressed and he was taken into custody. The officers performed a protective sweep of the house limiting their search to places where a person could be concealed. Nobody else was in the house at that time. No evidence, including the firearm from the Bronx shooting, was found or seized during Sanchez's arrest and during the sweep of the house.

When Sanchez was taken into custody he did not receive his *Miranda* warnings and Barclay did not tell him why he was arrested. However, Barclay introduced himself and told Sanchez he would speak to him at the police station. Sanchez was only wearing sweat pants and an undershirt and he asked the officers to get him a sweatshirt, shoes and socks telling them where they were located in the house. Sanchez identified the specific dresser drawer in his second floor bedroom where his socks were located. Task force officer Robert Hegedus went to get the socks and other clothing items for Sanchez

5

where he was advised to look. When Hegedus opened the dresser drawer, he saw stacks of cash and several cell phones. Hegedus then gave Sanchez the clothing he requested but he did not take the cash or cell phones. Hegedus did not ask Sanchez about the cash he saw in the drawer but he told other officers about it, including Lenahan. Sanchez was then transported to the PSP barracks in the area. Barclay, Hegedus, and two U.S. Deputy Marshals who were task force officers, including Lenahan, stayed at the house.

Later on May 7, 2015, the Bronx District Attorney's Office obtained an arrest warrant for Sanchez charging him with the New York shooting incident. (Doc. 69, Govt. Ex. 13).

During Sanchez's arrest at his Hazleton house, neither Barclay nor Hegedus asked Sanchez for consent to search the house. Nor did Barclay, Hegedus and Lenahan hear anyone ask Sanchez for consent to search the house. Additionally, they did not hear Sanchez tell any officer not to search the house. Barclay and Hegedus testified that they did not even know for sure if the house was in fact Sanchez's or Claudia's and, they stated that were not sure of the exact relationship between Sanchez and Claudia.

There is no dispute that Barclay and the officers never asked Sanchez for consent to search the house. Nor is there any dispute that Sanchez did not tell any officer not to search the house. The officers stated that they believed Claudia was the owner or leaseholder of the house with the authority to give

permission to search it. However, there was no evidence that the officers checked to determine who owned the Hazleton house or who was on the lease to the house. In fact, officers had information prior to arriving at the house that both Sanchez and Claudia had used the Butler Terrace house as their address and, that Claudia had changed her last name to Sanchez. (Exs. D-2 & D-3).

Following Sanchez's arrest and transport to the PSP barracks, two task force officers, namely, Hegedus and Lenahan, drove to Claudia's workplace. They advised Claudia of Sanchez's arrest and that the front door of the house had to be secured. At this time, the officers did not discuss or ask Claudia if she would consent to search the house as that was not their purpose. Claudia then drove to the house in her own vehicle. When Claudia arrived at the house, an officer provided her with a tort form to get reimbursed for her broken front door. Claudia went into the house and sat at the kitchen table with Barclay, Hegedus and Lenahan. She was upset over the incident but she was cordial and cooperative with the officers. The officers believed that Claudia may have been a victim of domestic violence so Barclay told her that she was safe and Sanchez would not be returning to the house.

Claudia was given written *Miranda* warnings before she was questioned and she signed a form indicating that she understood her rights and was willing to answer questions. (Govt. Ex. 3). Barclay then told Claudia that Sanchez was wanted for a shooting incident in New York and that the firearm

had not yet been found. Barclay then asked Claudia for consent to search the house. Barclay stated that he asked Claudia for the consent since he thought she owned the house and not Sanchez. In fact, he stated that he did not even think Sanchez lived in the house. Claudia then gave the officers consent to search the house and signed a consent to search form. (Govt. Ex. 2). Claudia was not threatened by any officer to give the consent and at no time was she taken into custody. Claudia also signed a consent to search form regarding two vehicles. (Govt. Ex. 4). Claudia was asked if she knew of any firearm in the house and where in the house Sanchez hung out. She was also asked about the cash seen in Sanchez's dresser drawer and she looked surprised. Barclay and the officers then conducted a complete search of the house. Their objective was to look for the firearm from the New York shooting. However, Hegedus stated that after Claudia consented to the search, the large amount of cash he saw in the dresser was on his mind. Further, Barclay stated that when Sanchez was arrested, Barclay had no idea they would encounter any drugs being in the house.

Lenahan stated that no search warrant for the house was obtained since it was much easier and more convenient to ask Claudia for consent. Hegedus testified that the initial goal of the task force was just to apprehend a fugitive and it was not to search the house.

In addition to Barclay, Hegedus and Lenahan, Claudia was called to testify at the hearing. Claudia stated that she was married to Sanchez for

eight years and in March 2013 they moved into the Butler Terrace Drive residence which was actually a townhouse. Claudia also testified that both she and Sanchez were on the lease to the house at all times and that they both paid the bills related to the townhouse. Further, Sanchez submitted law enforcement Comprehensive Reports dated April 22, 2015 as exhibits, Exs. D-2 & D-3, listing the Butler Terrace Drive house as one of the addresses associated with both Claudia and Sanchez. These reports were run by law enforcement officials as research in trying to locate Sanchez and the task force officers reviewed the reports prior to arriving at the Butler Terrace Drive house on May 7, 2015. The report on Claudia also indicated that at some point her last name changed from Rodriguez to Sanchez.

Claudia temporarily moved out the Butler Terrace Drive house in March 2015 and was living in an apartment in Hazleton. Sanchez stayed at the Butler Terrace house by himself. Claudia said that she suspected Sanchez may be involved in dealing drugs and saw some drugs in the house, and that this was one reason why she moved out. However, Claudia had moved back into the house a few days prior to May 7, 2015 and she shared a bedroom with Sanchez. However, she still maintained her separate apartment. She also remained on the lease to the Butler Terrace house at all times. Claudia did not inform the officers on May 7 that she had previously moved out of the house. But Claudia stated that prior to May 7, Barclay knew that she had another residence since he had spoken to her family in New York and they

advised him of this. At the time of the hearing, Claudia and Sanchez were still married but she no longer lived with him and she has filed for divorce.

Claudia admitted that she signed the consent to search form for the house and that she was not threatened or coerced in any manner. (Govt. Ex. 2). She also stated that officers told her they wanted to search the house to look for the firearm allegedly used by Sanchez in the Bronx shooting.

The search of the house by task force officers was then conducted. During the search, officers found approximately 200 grams of cocaine, approximately 300 grams of heroin, approximately $55,000 and a .40 caliber round of ammunition, in different areas of the house. Other items were also found including cell phones. Some of the drugs were found behind an access panel in a bathroom wall and the cash was found in Sanchez's dresser drawer with his socks and in envelopes taped to the back of pictures hanging on a wall. Barclay told Claudia about the cash and drugs which were discovered and she was surprised. No firearm was found in the house or the vehicles during the search.

After the cash and drugs were found, the federal Drug Enforcement Administration ("DEA") was contacted on May 7, 2015. Joseph Begley, a DEA Special Agent, and his partner were assigned and went to the Hazleton house. Begley testified that he then spoke to Hegedus and Lenahan about the search and that he again gave Claudia her *Miranda* rights. Claudia signed a form at 11:25 a.m. indicating that she was advised of her *Miranda* rights, that

10

she understood her rights and that she was willing to answer questions. (Govt. Ex. 3). Begley also asked Claudia to sign a DEA consent to search form for the house and the two vehicles, and she signed the form. (Govt. Ex. 4). Claudia was then questioned about the drugs found in the house. Claudia indicated that she suspected Sanchez may have been involved with drugs but she was not aware of the cash found in the house. Claudia then signed a disclaimer of ownership to the money and waived any right to it. (Govt. Ex. 7).

Begley then asked the NYPD if it objected to him questioning Sanchez about the drugs and there was no objection. Begley drove to the PSP barracks to interview Sanchez about the drugs. Sanchez signed a form at 12:25 p.m. on May 7, 2015 indicating that he was advised of his *Miranda* rights, that he understood his rights and that he was willing to answer questions about the drugs and cash found in his house. (Govt. Ex. 5). Begley indicated that he would not question Sanchez about the New York shooting case. Sanchez was cooperative and gave Begley a confession about his drug activities, including the locations where he hid drugs and cash. He also provided the names and numbers of his drug customers and suppliers, and signed a consent form allowing the DEA to search his cell phone. (Govt. Ex. 6).

Subsequently, the DEA determined that some of the drugs found in Sanchez's Hazleton house were heroin and not only cocaine as initially suspected. Thus, Begley went to interview Sanchez on May 8, 2015 at

11

Luzerne County Prison to clear up the types of drugs that were in his house. Sanchez signed another *Miranda* form at 3:05 p.m. indicating that he was advised of his rights and would answer questions. (Govt. Ex. 8). This second interview of Sanchez was over 24 hours after his first interview. Sanchez stated that some of the drugs in his house were in fact heroin and, that he had one source from where he obtained drugs in New York.

## II.  PROCEDURAL HISTORY

On May 12, 2015, a federal grand jury charged Sanchez with a three-count Indictment for the following charges: conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin and 500 grams or more of cocaine, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(A), (Count 1); possession with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(B), (Count 2); and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C), (Count 3). (Doc. 1). Sanchez had his initial appearance on May 19, 2015, and entered a plea of not guilty to all three counts. He was then ordered detained. (Doc. 9, Doc. 10).

Following a detention hearing, Sanchez was ordered released from confinement and conditions were imposed on his release on June 20, 2016. (Doc. 52).

On June 27, 2016, Sanchez filed a motion to suppress, (Doc. 53), with

a supporting brief, (Doc. 54). On September 29, 2016, the government filed, *nunc pro tunc*, a brief in opposition to the motion. (Doc. 56). Sanchez seeks to suppress all of the evidence seized from the search of his house as well as his subsequent statements made while he was in custody. He also requested the court to hold an evidentiary hearing regarding his motion.[1]

An evidentiary hearing was conducted on January 10, 2017 and testimony was heard and exhibits were submitted.[2] The court ordered supplemental briefs to be submitted based on the hearing record. (Doc. 67). The government filed its supplemental opposition brief on February 1, 2017. (Doc. 70). Sanchez also filed his supplemental brief in support of his motion on February 1, 2017. (Doc. 71). The government and Sanchez both filed their reply briefs on February 8, 2017. (Doc. 72, Doc. 73).

## III.   LEGAL STANDARD

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

---

[1]This case was originally assigned to U.S. District Court Judge Kosik. It was reassigned to the undersigned on September 16, 2016.

[2]"[I]t is well-settled that, at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" U.S. v. Wadley, 2007 WL 4593508, *2 (W.D.Pa. Dec. 28, 2007) (citing U.S. v. Richardson, 501 F.Supp.2d 724, 734 (W.D.Pa. 2007)

and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D.Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753–55, 130 S.Ct. 3020, 3028, (2010)). The court in Adams, 17 F.Supp.3d at 491, stated:

> [W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. ——, ——, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). At the "very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). The applicable constitutional text, which refers to "[t]he right of the people to be secure in their ... houses ... against unreasonable searches and seizures," draws a line at the entrance of a house that is both "firm" and "bright." Kyllo v. United States, 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Searches and seizures conducted inside of a home are presumptively "unreasonable" when they are not authorized by a warrant. Groh v. Ramirez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).

"In the absence of consent or exigent circumstances, ... , police officers need a warrant in order to enter an individual's home for the purpose of making an arrest." Id. (citing Kirk v. Louisiana, 536 U.S. 635, 638, 122 S.Ct. 2458 (2002) (per curiam ); U.S. v. Coles, 437 F.3d 361, 365 (3d Cir. 2006)

14

("Warrantless searches and seizures inside someone's home [ ] are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion.") (citations omitted); Payton v. New York, 445 U.S. 573, 576, 100 S.Ct. 1371 (1980) (Supreme Court held that the Fourth Amendment "prohibit[ed] the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." The warrant requirement for officers to enter a person's home operates as the Fourth Amendment's "principal protection against unnecessary intrusions into private dwellings." Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091 (1984)).

The exclusionary rule calls for the suppression of evidence obtained during an unconstitutional search or illegal seizure. "The independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of 'evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality.'" U.S. v. Stabile, 633 F.3d 219, 243 (3d Cir. 2011), cert. denied, 565 U.S. 942 (2011) (citations omitted).

## IV.  DISCUSSION

This court has jurisdiction over the motion to suppress under 18 U.S.C. §3231.

Sanchez moves to suppress evidence under Fed.R.Crim.P. 12(b)(3)(C).

Sanchez argues that his Fourth Amendment rights were violated since no exigent circumstances existed for officers to enter his home without an arrest warrant and without a search warrant. Thus, he claims that all of the evidence subsequently seized in his house as well as his statements should be suppressed under the fruit of the poisonous tree doctrine. The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528, 87 S.Ct. 1727 (1967). The exclusionary rule calls for the suppression of evidence obtained during an unconstitutional search or illegal seizure. Moreover, "the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Segura v. U.S., 468 U.S. 796, 804, 104 S.Ct. 3380 (1984) (citations omitted).

The government contends that it established the existence of probable cause and exigent circumstances to justify the officers' forcible entry into Sanchez's house and his arrest. "Probable cause is established where the facts and circumstances within an arresting officer's knowledge are 'sufficient to warrant a reasonable person to believe an offense has been committed.'" U.S. v. McMillion, 2011 WL 9110, *2 (M.D.Pa. Jan. 3, 2011) (citing U.S. v. McGlory, 968 F.2d 309, 342 (3d Cir.1992)). In Coles, 437 F.3d at 366, the court stated that exigent circumstances exist where "the need for effective law

16

enforcement trumps the right of privacy and the requirements of [an arrest warrant], thereby excusing an otherwise unconstitutional intrusion." (citation omitted). "Examples [of exigent circumstances] include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." Id. (citation omitted). "However, exigent circumstances fail to meet Fourth Amendment standards 'if the government deliberately creates them.'" McMillion, 2011 WL 9110, *2 (citing Coles, 437 F.3d at 366).

Initially, the court finds that Sanchez has sufficiently shown legitimate expectations of privacy in his house located at 215 South Butler Terrace in Hazleton and thus, has standing to challenge the search. Fourth Amendment rights are "personal" and the defendant "bears the burden of proving not only that the search ... was illegal, but also that he had a legitimate expectation of privacy in [the Butler Terrace house]." U.S v. Stearns, 597 F.3d 540, 551 (3d Cir. 2010) (citations omitted). "Fourth Amendment standing 'requires that the individual challenging the search has a reasonable expectation of privacy in the property searched ... and that he manifest a subjective expectation of privacy in the property searched[.]'" Kennedy, 638 F.3d at 163 (quoting U.S. v. Baker, 221 F.3d 438, 441 (3d Cir. 2000)). "[A] reasonable or legitimate expectation of privacy must have 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Id. (citations

17

omitted). The question of whether a person has legitimate expectation of privacy "turns on two specific questions: '(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances.'" U.S. v. Donahue, 764 F.3d 293, 298-99 (3d Cir. 2014) (citation omitted).

Based on the hearing evidence, the court finds that Sanchez has standing to challenge the search of the house at 215 South Butler Terrace. Claudia stated that Sanchez lived in the house since March 2013, that he was on the lease at all times and that he contributed money towards the payment of the bills associated with the house. Also, Sanchez's clothes were in the house. Thus, Sanchez had a reasonable expectation of privacy in the house, and he has standing to challenge the forcible entry into the house, his arrest and the subsequent search.

The hearing testimony and exhibits also demonstrate that the officers had probable cause to arrest Sanchez on May 7, 2015. Sanchez was wanted by the NYPD for the January 17, 2015 shooting in the Bronx where the victim was shot in the leg with a firearm. The charge for which Sanchez was wanted was a first degree felony of assault with intent to cause serious injury with a weapon. (Govt. Ex. 12). The government's witnesses testified that they knew Sanchez was wanted for a serious violent felony in New York. They were also aware that the Bronx DA would issue an arrest warrant when Sanchez was

18

located. Further, Lenahan saw Sanchez look out of the second story window in the house. In fact, Sanchez agrees with the government that the officers had probable cause to arrest him. (Doc. 73 at 1). Thus, the court finds that the officers had probable cause to arrest Sanchez who was identified as the person in the house and who was wanted in connection with a serious felony.

Next, the court must determine if the government established that exigent circumstances existed to forcibly enter Sanchez's house without an arrest warrant and without a search warrant. "[The court] must evaluate whether exigent circumstances existed by an objective standard; the subjective intent of the officer is irrelevant." U.S. v. Mallory, 765 F.3d 373, 384 (3d Cir. 2014) (citation omitted); U.S. v. White, 784 F.3d 507, 511 (3d Cir. 2014) ("A warrantless search of a home is [ ] permitted 'when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" (citation omitted). "The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is 'heavy.'" Mallory, 765 F.3d at 384 (citation omitted). There is no question that "[e]xigent circumstances exist when officers 'reasonably ... believe that someone is in imminent danger." Id. (citations omitted). "The common thread [for the different types of recognized exigent circumstances] is imminence—'the existence of a true emergency.'" Id. (citations omitted). The government contends that the forcible entry into Sanchez's house was

19

justified by a need to protect the safety of the officers. The issue in this case is whether the officers objectively reasonably believed that they were in imminent danger on May 7, 2015 when they were outside Sanchez's house in Hazleton. If not, then the initial forced entry into the house was unlawful under the Fourth Amendment.

The government states, (Doc. 70 at 13), "the [hearing] testimony supports a finding that the arresting officers had a good faith, objectively reasonable belief that Sanchez posed a danger to their lives and safety." Sanchez states that the officers did not have a good faith, objectively reasonable belief that he was armed relying only upon dated information that he had a firearm in the Bronx in January 2015, four months prior to their arrival at his Hazleton house. Sanchez points out that officers had no information that he possessed or owned a firearm at any other time and, that they did not have any information that he possessed a firearm at any time while he was in Pennsylvania and when he was in his house on May 7, 2015. (Doc. 73 at 2-3). Sanchez also states that he did not pose any threat to the safety of the officers at about 6:30 a.m. He states that he merely appeared in the second floor window of the house for a few seconds and when the officers directed him to come to the door, he turned away from the window. The government's witnesses then indicated that it was 15 seconds to a few minutes before the ram was obtained from one of the officer's vehicles and the door to Sanchez's house was breached open. Hegedus stated that officer

waited a "reasonable time" sufficient for a person to answer the door after Sanchez was seen in the window and told to open the door before they got the ram. When the door was forced opened, Sanchez was on the stairs, not completely dressed, facing towards the door with no firearm.

These stated facts, considered together, do not establish the exigent circumstances necessary for a warrantless entry into Sanchez's house. Nor do they establish that the officers had an objectively reasonably belief that they were in imminent danger when they were initially outside Sanchez's house and when nobody opened the door after they knocked and announced their presence. The court finds that the government failed to produce sufficient evidence to demonstrate that exigent circumstances existed even after Sanchez was seen in the window simply because he walked away from the window and then failed to open the door, assuming *arguendo* that he was given sufficient time to open it. At that point, the officers still did not demonstrate that they had a good faith, objectively reasonable belief that Sanchez posed an imminent danger to their lives. He did not threaten the officers in any manner and his behavior did not indicate that he was a threat. He was not observed in the window with any weapon. It was simply not objectively reasonable for an officer to have believed that Sanchez may be going to get the firearm from the New York shooting which allegedly occurred four months earlier. The officers presented no evidence to show that they had good reason to believe that a dangerous weapon may be nearby to where

Sanchez was seen or even in the house. The mere possibility that Sanchez may have the firearm in his house he allegedly used in New York four months earlier was simply too remote to give the officers a reasonable belief that they were in imminent danger.

As such, the government failed to meet its "heavy burden" and failed to demonstrate "the existence of a true emergency." The government failed to present any evidence as to why the officers could not have safely retreated from the front of the house and continued to conduct surveillance of the house and, then obtain an arrest warrant and if deemed required, a search warrant from a judicial officer to look for the firearm. Further, there was no likelihood that Sanchez could escape with the officers surrounding his house.

Following the officers forced entry into the house, Sanchez was seized, arrested and taken into custody. The officers then conducted a sweep of the house to secure the premises and to make sure there were no persons left unaccounted for who might pose a threat to the officers. During the tertiary search for other persons, nobody else was found in the house and no firearms or contraband were seen by the officers.

After Sanchez was taken into custody, he asked Hegedus to go and get his shoes as well as his socks in his dresser in his bedroom since he did not get fully dressed in the early morning hours before officers entered his house. Hegedus obliged Sanchez's request and observed a large amount of cash, cell phones as well as the electronic devices in the drawer when he was

obtaining the socks. Sanchez was given his shoes and socks and then taken to the PSP barracks. Hegedus did not take any of the other items in the drawer when he got the socks. The officers did not obtain a search warrant for Sanchez's house, nor did they ask Sanchez for consent to search the house. There was also no evidence that Sanchez directed officers not to search his house

Shortly thereafter, a few of the officers traveled to Claudia's workplace and advised her what transpired at the house and asked her to come to the house solely to make arrangements to secure the damaged front door. When she arrived at the house, Sanchez had already been taken to the PSP barracks. The officers explained to Claudia why Sanchez was arrested and about the shooting incident in New York. Claudia stated that the officers asked her if they could search the house to look for the firearm Sanchez allegedly used in the New York shooting. Claudia then provided the officers with consent to search the house. The officers did not find a firearm but they found a .40 caliber bullet. They also discovered a large amount of cash totaling $54,283, including the previously seen cash in Sanchez's dresser, cell phones and drugs in the house.[3] The issue now becomes whether the search of Sanchez's house and his statements were sufficiently attenuated from the unlawful entry into his house or whether they should be suppressed as "fruit

_____

[3]*See* Govt. Ex. 11 for a list of items seized during the search of Sanchez's house. Exhibit 11 also details the statements Sanchez made to DEA agents on May 7 and May 8, 2015.

of the poisonous tree."

In U.S. v. Wade, 628 Fed.Appx. 144, 148 (3d Cir. 2015), the Third

Circuit stated:

> Evidence obtained as a result of a Fourth Amendment violation
> ordinarily must be suppressed as "fruit of the poisonous tree."
> Wong Sun v. United States, 371 U.S. 471, 487–88, 83 S.Ct. 407
> (1963). Evidence is not fruit of the poisonous tree and need not
> be suppressed, however, "if the connection between the illegal
> police conduct and the discovery ... of the evidence is so
> attenuated as to dissipate the taint." United States v. Perez, 280
> F.3d 318, 338 (3d Cir. 2002) (internal quotation marks and citation
> omitted). *Miranda* warnings alone do not necessarily render a
> confession free of the taint of an earlier Fourth Amendment
> violation. Brown v. Illinois, 422 U.S. 590, 603, 95 S.Ct. 2254
> (1975). Rather, pursuant to *Brown*, to determine whether this
> causal connection is sufficiently attenuated, we consider: (1) the
> temporal proximity between the unlawful conduct and the
> recovery of the evidence; (2) "the presence of intervening
> circumstances"; and (3) "particularly, the purpose and flagrancy"
> of the unlawfulness. Id. at 603–04, 95 S.Ct. 2254; *see also* United
> States v. Dupree, 617 F.3d 724, 739 (3d Cir. 2010).

Sanchez argues that in applying the *Brown* factors, the only factor that

favors the government is that he was given *Miranda* warnings each time

before his statements on May 7 and 8, 2015. However, as indicated above,

*Miranda* warnings do not alone sufficiently "render a confession free of the

taint of an earlier Fourth Amendment violation." Id. (citing Brown, 422 U.S. at

603). Sanchez states that the three *Brown* factors all weigh in favor of

granting his suppression motion. The court has found that the forced entry

into Sanchez's house violated the Fourth Amendment. The discovery by

Hegedus of a large amount of cash as well as the cell phones and the

24

electronic devices in Sanchez's dresser drawer is of no moment since nothing was seized when he was retrieving socks for Sanchez. (Doc. 69 at 55-56, 66). Nor was anything discovered during the protective sweep of the house.

The court must now determine whether the causal connections between the search of Sanchez's house after Claudia's consent as well as his statements are sufficiently attenuated from the unlawful entry into his house.

As indicated, after Sanchez's house was unlawfully entered and he was arrested and taken into custody, officers completed a protective sweep of his house. After this protective sweep, any claimed exigency would have been over and the officers would generally have been required to obtain a search warrant if they wanted to further search Sanchez's house. Rather than getting a search warrant, officers asked Claudia to come back to the house to secure the front door. She willingly agreed and drove herself to the house. The officers then obtained Claudia's consent to search the house, ostensibly to look for the firearm from the New York shooting, after Sanchez had been removed from the scene and was taken to the PSP barracks.

The Third Circuit in Stabile, 633 F.3d at 230-31, addressed a warrantless search of a person's house and explained:

> The Fourth Amendment prohibits unreasonable searches and seizures. *See* Illinois v. Rodriguez, 497 U.S. 177, 183, 110 S.Ct. 2793 (1990); United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009); Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371 (1980). In general, a "warrantless entry into a person's house is unreasonable per se." *See* Payton, 445 U.S. at 586, 100 S.Ct. 1371. However, there are exceptions to this rule. *See* Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253 (1958).

Consent is an exception to the "requirements of both a warrant and probable cause." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973); *see* Florida v. Jimeno, 500 U.S. 248, 250–51, 111 S.Ct. 1801 (1991) (approving consent searches because a search permitted by consent is reasonable). Consent must be given voluntarily, Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788 (1968), and voluntariness may be gleaned from considering a range of factors. *See* Price, 558 F.3d at 279; United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). The individual giving consent must also possess the authority to do so, *see* Rodriguez, 497 U.S. at 181, 110 S.Ct. 2793, and "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," United States v. Matlock, 415 U.S. 164, 170, 94 S.Ct. 988 (1974). Common authority rests not on property rights but "rather on mutual use of the property by persons generally having joint access or control ... so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 172 n. 7, 94 S.Ct. 988.

"The Government bears the burden of demonstrating that consent to search was given by a preponderance of the evidence." Wadley, 2007 WL 4593508, *3 (citations omitted).

The court finds that Claudia had full authority to consent to the search since she and Sanchez lived in the house and co-leased the property. Claudia testified that she and her husband Sanchez both signed the lease and paid the house expenses since they moved in the house together in March 2013. She also stated that she was living in the house with Sanchez at the relevant time. *See* Stabile, 633 F.3d at 230 (Third Circuit held that woman, despite mistaken belief that she was married to defendant, "had common authority to consent to a search of the house because, as a cohabitant, she mutually used

26

the property along with [defendant] and exercised joint access and control over the house." (citation omitted). Also, when Claudia gave consent for the search, Sanchez was not present at the house and he was not asked for consent to search when he was present. Further, Sanchez did not tell officers not to search the house or that he would not consent to a search. There was no evidence presented by Sanchez that the officers deliberately circumvented the law by removing him from the house without ever asking him for consent to get Claudia's consent as his counsel suggested at the hearing. Thus, there was no prior refusal to allow a search by Sanchez and Claudia had legal authority to consent at the time of the search. Id. at 231 ("[B]ecause [cohabitant] exercised her access and control over the premises absent any contemporaneous refusal by a co-resident [defendant], she had authority to consent at the time of the search.").

The undisputed evidence also reveals that Claudia's consent to search the house was knowingly and voluntarily given. The court "determine[s] the voluntariness of a consent by examining the totality of the circumstances." Id. (citation omitted). The court also "consider[s] such factors as 'age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment.'" Id. (citation omitted). Also relevant are the "setting in which the consent was obtained [and] the parties' verbal and non-verbal actions." Id. (citation omitted).

The testimony discussed above, shows without doubt that Claudia was 33 years old, was intelligent, was advised of her *Miranda* rights, was cooperative with officers while they were all sitting in her kitchen, was not threatened and, that she willingly signed two consent to search forms regarding the Butler Terrace house and two vehicles. (Govt. Exs. 2-4). Claudia later signed a form indicating that she disclaimed any ownership to the cash found in the house. (Govt. Ex. 7). Claudia was also concerned that a firearm may be in the house and she assisted officers regarding rooms in the house Sanchez frequently used. Based on the totality of the circumstances, Claudia's consent was voluntary. *See* Stabile, 633 F.3d at 231.

In applying the *Brown* test regarding the evidence seized from the house after Claudia's consent for the search as well as Sanchez's incriminating statements made after his arrest, the court finds that the unlawful entry into Sanchez's house does not taint the evidence or his statements. The facts in this case pass the *Brown* test based on the amount of time that passed between the unlawful entry into the house and the intervening circumstances of Claudia's lawful consent to search the house which render the evidence seized in the house and Sanchez's statements sufficiently attenuated from the unconstitutional conduct of the officers. Neither the search of the house nor Sanchez's questioning by the DEA agents and his statements were conducted immediately after the unlawful

28

entry into his house. Additionally, even though the court has found that the government did not present enough evidence to meet its heavy burden to show that exigent circumstances existed to allow a warrantless, in-home arrest of Sanchez, the court does not find that the officers' conduct was flagrant or driven by an improper purpose.

To summarize: Claudia was not present at the house when Sanchez was arrested and taken into custody; she was not threatened to give her consent; and her consent was knowingly and voluntarily given "untainted by any [ ] illegality related to [Sanchez's] arrest." (Doc. 72 at 7). Indeed, the evidence obtained from the house by officers after Claudia's valid consent was used by DEA agents to question Sanchez on May 7 and May 8, 2015 about his drug offenses and it lead to his confessions. Sanchez's statements were given hours after his arrest, i.e., from 6:30 a.m. to 12:25 p.m. on May 7, 2015, and at 3:05 p.m. on May 8, 2015, and at locations different from his house, i.e., the PSP barracks on May 7 and at the Luzerne County Prison on May 8. Prior to giving both statements to DEA agents, Sanchez was advised of his *Miranda* warnings and he signed waiver of rights forms. (Govt. Exs. 5 & 8). He also signed a consent to search form for his cell phone on May 7. (Govt. Ex. 6). A summary of Sanchez's detailed statements he provided to DEA agents on both days as well as the circumstances surrounding his statements are contained in Govt. Ex. 11, DEA investigation report.

Thus, the court finds that all of the evidence seized by officers in

29

Sanchez's house and both of Sanchez's statements made after his arrest, were sufficiently attenuated from the unlawful entry into the house to purge the taint of the illegality. *See* U.S. v. Perry, 2009 WL 1444286 (M.D.Pa. May 21, 2009) (Despite the fact that the court found the entry into defendant's house was unlawful since there were no exigent circumstances, the court denied defendant's motion to suppress evidence found in house during a subsequent search since his wife voluntarily consented to search and the officers did not conduct a full search prior to her consent. The court also found under *Brown* factors that wife's valid consent to search "was sufficiently independent of the warrantless in-home arrest so as to be lawful."). As such, the court will deny Sanchez's motion to suppress physical evidence and his statements in its entirety.

## V.    CONCLUSION

Based on the foregoing, the court finds that exigent circumstances did not exist for officers to forcibly enter Sanchez's house. However, the court finds that all of the evidence seized from Sanchez's house and his statements were sufficiently attenuated from the unlawful entry into the house to purge the taint of the illegality. Thus, Sanchez's motion to suppress, (Doc. 53), will be **DENIED IN ITS ENTIRETY**. An appropriate order will be issued.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 24, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CRIMINAL MEMORANDA\2015 CRIMINAL MEMORANDA\15-87-01-revised2.wpd